UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| TIAUNA JACKSON,<br><br>                    Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF SOUTH DAKOTA;<br>SOUTH DAKOTA BOARD OF REGENTS;<br>SHEILA KAY GESTRING, *individually and in her official capacity as President of the University of South Dakota;*<br>NEIL FULTON, *individually and in his official capacity as Dean of USD Knudson School of Law;*<br>SHIRLEY MAYS, *individually and in her official capacity as Associate Dean of Academic Affairs;*<br>ROBERT MILLER, *individually and in his official capacity as Assistant Professor of Law;*<br>TYLER SCOTT MOORE, *individually and in his official capacity as Associate Professor of Law;*<br>KATEY ANN ULRICH, *individually and in her official capacity as Director of Admissions and Marketing;*<br>EMMA THOMPSON, *individually and in her official capacity as Director of Student Rights and Responsibilities;*<br>KATHLEEN A. FITZGERALD, *individually and in her official capacity as Dean of Students;*<br>ANTHONY JAMES FRANKEN, *individually and in his official capacity as General Counsel;*<br>CHRISTOPHER HEALY, *individually and in his official capacity as Deputy General Counsel;*<br>JEAN M. MERKLE, *individually;*<br>JENNIFER LEIGH FUERST, *individually;*<br>JULIANNE MARI SEVERSON, *individually;*<br>LANAE N. ROMEY, *individually; and*<br>JANE and JOHN DOES 1-10, *individually,*<br>                    Defendants. | Case No. 4:26-cv-4069<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

## I. INTRODUCTION

1.      On March 27, 2024, at 9:01 AM, the University of South Dakota certified Tiauna Jackson "in good academic standing." Hours later, three separate offices launched simultaneous adverse actions against her: a disciplinary prosecution, a No Contact Order restricting her

campus access, and a fraud referral to the Law School Admission Council that threatened to end her legal career nationwide. Every action targeted the same conduct: social media posts criticizing the law school's Black History Month display.

2.  Jackson is a Black woman, service-connected disabled veteran, and registered student with disabilities whose education at USD Knudson School of Law was funded by VA Chapter 31 Vocational Rehabilitation benefits. She is an ordained minister, the founder of an AFTRA/WGA/DGA-franchised talent agency, and the first woman of her background elected to the Board of Directors of the Association of Talent Agents. She relocated to South Dakota to attend USD's law school.

3.  The coordinated attack began when Jackson posted videos on social media describing the law school's Black History Month display — assembled from elementary school craft supplies in a Ziploc bag — as inadequate for a professional institution. Her speech was protected under the First Amendment, Article VI, Section 5 of the South Dakota Constitution, and SDCL § 13-53-52, which expressly prohibits public institutions of higher education from restricting student expression in outdoor areas of campus.

4.  The March 5, 2024 email chain documents the coordination. At 7:29 AM, Jennie Fuerst emailed Dean Fulton with Jackson's video. At 9:34 AM, Fulton forwarded to General Counsel with six words: "One more entry. On my way." At 10:45 AM, General Counsel directed "formal intake and investigation as soon as possible." By 11:38 AM, the Title IX Coordinator had the file. In three hours, a student's YouTube video became a multi-office investigation.

5.  The official who issued the No Contact Order admitted six days later that "a policy has not been violated," that the Order was issued to "ask you to stop talking about Jennie in the

videos," and that she lacked "any way of policing what you're saying on video online." She lifted the Order the same day she made these admissions.

6.     The Director of Admissions filed fraud accusations with LSAC without checking Jackson's student file, which contained a seven-month-old amendment disproving the accusation. LSAC's own Charge Letter cited Jackson's Howard University application — the same application that disclosed the enrollment Ulrich accused Jackson of concealing. LSAC withdrew in thirteen days.

7.     The Examiner who prosecuted Jackson for 190 days was her own academic advisor, was not admitted to the South Dakota bar, and CC'd Dean Fulton on investigative actions. He continued the prosecution after Jackson's attorney demanded dismissal on First Amendment grounds and after the official who issued the No Contact Order determined no policy had been violated. The Disciplinary Board ultimately found the charges were "not a basis to proceed."

8.     Every adverse action collapsed when confronted with evidence. The No Contact Order was lifted in six days. The LSAC charge was withdrawn in thirteen days. The disciplinary prosecution was dismissed after 190 days. No tribunal, board, or institutional official ever determined that Jackson lied on her application, violated any policy, or engaged in any misconduct. Jackson was never expelled or discharged from USD. She departed on an approved leave of absence after Defendants' coordinated conduct made continued enrollment untenable. The harm is permanent. Under *In re Application of Widdison*, 539 N.W.2d 671, 674 (S.D. 1995), Jackson must disclose these proceedings on every bar application for the rest of her career regardless of their outcome.

9.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Jackson's claims arise under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1985(3), Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990. This is not a case about student admissions, academic standards, or the internal management of a state university. It is a case about coordinated government retaliation against a citizen's constitutionally protected speech — the category of claim for which Congress enacted 42 U.S.C. § 1983 to provide a federal forum. *Mitchum v. Foster*, 407 U.S. 225, 238-42 (1972). No abstention doctrine applies. Pullman abstention requires an unsettled question of state law whose resolution might moot the federal constitutional issue. *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941). No state law question is presented; every claim rests on federal constitutional or statutory grounds. The Eighth Circuit has confirmed that Pullman abstention exists in an "extraordinary and narrow" form and is "a limited exception to the virtually unflagging obligation that federal courts have to exercise their jurisdiction in proper cases." *Hunter v. Page County, Iowa*, 102 F.4th 853, 873 (8th Cir. 2024) (quoting *Sisney v. Kaemingk*, 15 F.4th 1181, 1189 n.2 (8th Cir. 2021)). Colorado River abstention requires a parallel state proceeding. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). There is none. Younger abstention requires an ongoing state judicial proceeding. *Younger v. Harris*, 401 U.S. 37, 41 (1971). There is none. Section 1983 contains no exhaustion requirement. *Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982).

10.    Jackson brings seventeen counts against sixteen defendants for violations of the First Amendment, the Equal Protection Clause, procedural due process, Title VI, Title IX,

Section 504, the ADA, and South Dakota tort law. She seeks compensatory and punitive damages, declaratory relief, injunctive relief including expungement of all retaliatory proceedings from her record, and an order certifying to bar admission authorities that these proceedings were retaliatory and without merit.

## II. JURISDICTION AND VENUE

11. This Court has original jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they arise from the same case or controversy as the federal claims and share a common nucleus of operative fact.

12. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in Vermillion, Clay County, South Dakota, within this District.

13. All claims are timely. The coordinated adverse actions began on March 27, 2024 and continued through October 3, 2024. Plaintiff timely commenced this action on March 26, 2026 as Case No. 4:26-cv-04060 in this District. That action was dismissed without prejudice on April 6, 2026. This refiled complaint reasserts all claims from the prior action. Section 1983 claims borrow South Dakota's three-year personal injury statute of limitations, SDCL § 15-2-14, and are independently timely. State tort claims subject to a two-year limitation under SDCL § 15-2-15, including the libel per se claim in Count VIII, were timely when first filed on March 26, 2026. The limitations period for all supplemental state law claims was tolled during the pendency of the prior action and for thirty days following its dismissal pursuant to 28 U.S.C. § 1367(d). *Artis v. District of Columbia*, 583 U.S. 71, 78-79 (2018) (holding that § 1367(d) stops the limitations clock, not merely

provides a grace period). The continuing violation doctrine applies to the pattern of conduct alleged herein.

## III. PARTIES

### A. Plaintiff

14.    Plaintiff Tiauna Jackson is a Black woman, service-connected disabled veteran, and registered student with disabilities who was enrolled at USD Knudson School of Law from August 2023 through August 2024. Jackson is domiciled in Maricopa County, Arizona, and maintains a virtual business office at 101 S. Reid Street, Suite 307, Sioux Falls, South Dakota 57103.

### B. Institutional Defendants

15.    Defendant University of South Dakota ("USD") is a public university and instrumentality of the State of South Dakota, located in Vermillion, South Dakota. USD receives federal financial assistance including VA Chapter 31 funds, Pell Grants, and federal student financial aid, subjecting it to Title VI, Title IX, Section 504, and the ADA.

16.    Defendant South Dakota Board of Regents ("Board of Regents") is the governing body for South Dakota's public university system, responsible for policy oversight including SDBOR Policies 1.4.3 and 1.4.4 governing discrimination complaints at all institutions in the system.

17.    Defendant Sheila Kay Gestring is President of USD. On November 25, 2024, Gestring signed a Resolution Agreement with the U.S. Department of Education Office for Civil Rights (OCR Docket No. 07-24-2185) acknowledging disability access violations. Gestring is sued in her official capacity for injunctive relief.

### C. Individual Defendants

18.     Defendant Neil Fulton is Dean of USD Knudson School of Law. Before becoming Dean, Fulton served nine years as the Federal Public Defender for the Districts of South Dakota and North Dakota. Fulton is the final policymaker for student discipline within the law school. Fulton is sued in his individual and official capacities.

19.     Defendant Shirley Mays is Associate Dean of Academic Affairs at USD Knudson School of Law. Mays holds a J.D. from Harvard Law School. Mays is sued in her individual and official capacities.

20.     Defendant Robert Miller is an Assistant Professor of Law at USD Knudson School of Law who served as Examiner in the disciplinary proceedings against Plaintiff. Miller's bar admissions include Tennessee and North Carolina; upon information and belief, Miller is not admitted to the South Dakota bar. Miller is sued in his individual and official capacities.

21.     Defendant Tyler Scott Moore is an Associate Professor of Law at USD Knudson School of Law. Moore holds a Ph.D. in Political Science from the University of Notre Dame and a J.D. from Georgetown University Law Center. Moore is sued in his individual and official capacities.

22.     Defendant Katey Ann Ulrich is Director of Admissions and Marketing at USD Knudson School of Law. Ulrich does not hold a law degree. Ulrich is sued in her individual and official capacities.

23.     Defendant Emma Thompson is Director of Student Rights and Responsibilities at USD. Thompson holds a Master of Science in Forensic Psychology from Arizona State University; she does not hold a law degree. Thompson is sued in her individual and official capacities.

24. Defendant Kathleen A. Fitzgerald is Dean of Students at USD and Thompson's direct supervisor. Fitzgerald is sued in her individual and official capacities.

25. Defendant Anthony James Franken, p/k/a AJ Franken, is General Counsel for USD. Franken graduated first in his class at USD Knudson School of Law and clerked for the South Dakota Supreme Court. Franken is sued in his individual and official capacities.

26. Defendant Christopher Healy is Deputy General Counsel for USD. Healy is sued in his individual and official capacities.

27. Defendant Jean M. Merkle served as Director of EEO and Title IX Coordinator at USD from 2020 through 2025. Merkle is sued individually.

28. Defendant Jennifer Leigh Fuerst, p/k/a Jennie Fuerst, is a former USD law student and library employee who constructed the Black History Month display, filed complaints against Plaintiff, and conducted sustained surveillance of Plaintiff's social media. Fuerst is sued individually.

29. Defendant Julianne Mari Severson is a USD law student who filed a misconduct complaint against Plaintiff. Severson is sued individually.

30. Defendant Lanae N. Romey is, upon information and belief, a citizen of South Dakota employed by the State of South Dakota as an Accountant/Auditor. Romey previously served as Senior Secretary at USD Knudson School of Law from January 2018 through August 2020. Romey compiled the LSAC evidence dossier as identified through embedded PDF metadata. Romey is sued individually.

31. Defendants Jane and John Does 1-10 are individuals whose identities are not yet known to Plaintiff but who participated in the acts described herein.

## IV. FACTUAL ALLEGATIONS

## A. Enrollment, Accommodations, and Institutional Context

32.    Plaintiff enrolled at USD Knudson School of Law for the Fall 2023 semester. Her education was funded through VA Chapter 31 Vocational Rehabilitation benefits earned through military service. Under 38 C.F.R. § 21.292(b)(3), the VA may only approve courses at institutions certified in compliance with Section 504 and the ADA.

33.    Before Plaintiff's first class, USD had full notice of her disabilities and approved accommodations. On July 14, 2023, Karen Gerety, USD Disability Services Coordinator, emailed Associate Dean Mays with Plaintiff's accommodation memo, copying Admissions Director Ulrich and Registration Officer Teresa Carlisle.

34.    On August 1, 2023, USD issued Plaintiff's Fall 2023 accommodation memo approving audio recording of lectures, amplification devices, and other accommodations. On January 2, 2024, USD issued the Spring 2024 memo, approving the same accommodations.

35.    On January 10, 2024, Plaintiff delivered the Spring 2024 accommodation memo to Professor Moore by email, with Disability Services Coordinator Gerety copied. The memo instructed faculty: "If after talking to the student you need further clarification, please contact our office."

36.    On August 3, 2023, Plaintiff submitted an application amendment and letter of good standing to Registration Officer Teresa Carlisle, documenting her prior law school enrollment. Carlisle forwarded the documentation to Dean Mays.

37.    USD Knudson School of Law, according to ABA Standard 509 Required Disclosures, graduated an average of 0.8 Black students per year between 2009 and 2023. In Fall 2023, five Black students enrolled in the 1L class. In Fall 2024, after the events described herein, zero Black students enrolled. Plaintiff was one of five Black students in the 1L class and one of three Black women.

38.     On November 25, 2024, USD signed a Resolution Agreement with OCR (Docket No. 07-24-2185) to resolve an investigation into whether USD's online programs contained inaccessible documents, confirming a pattern of disability access violations during the same period Plaintiff was enrolled.

**B. The Black History Month Display and Protected Speech**

39.     On February 1, 2024, the USD law school library erected a Black History Month display outside its entrance. The display was assembled from elementary school craft supplies — cut-out paper, a Ziploc bag, and items indistinguishable from a child's craft kit.

40.     Plaintiff posted videos on social media describing the display as inadequate for a law school. Her posts did not name any individual by name. Press coverage followed; the display was reported nationally.

41.     On February 22, 2024, Plaintiff met with Library Director Sarah Kammer, Associate Dean Mays, and others. Kammer acknowledged the library had not consulted any Black student before creating the display. The display was removed the next day.

42.     On March 1, 2024, Fuerst removed the replacement display materials from the library and placed them on Plaintiff's desk in the basement carrel area. Plaintiff reported the incident to Library Director Kammer by email that morning.

43.     At 10:22 AM, Plaintiff emailed Kammer with Mays, Fulton, the NAACP, and Rebecca Porter on CC, expressing concern that the display materials had been placed on her desk in a targeted manner. At 11:18 AM, Kammer responded that it was "possible a student worker was just trying to be helpful" and noted Plaintiff's belongings were "spread over several carrels."

**C. The Investigation (March 4-27, 2024)**

Page 10

44.    On March 4, 2024, Mays texted Fuerst: "Now can you file an administrative complaint?" Fuerst responded: "Not from what I could tell reading it. Maybe I'm missing something." The Associate Dean of Academic Affairs solicited a formal complaint from a student who confirmed she saw no grounds to file one.

45.    That same day, Fuerst emailed Fulton and Mays claiming Plaintiff could "easily come to the school and hurt me." During the period she expressed this fear, Fuerst continued attending classes on the same campus as Plaintiff, sat in the same classrooms, and made no request for a protective order or security measures.

46.    On March 4, 2024, classmates contacted Plaintiff with claims that she had withdrawn from law school. By March 7, a second student reported the same rumor. Plaintiff had not withdrawn.

47.    On March 5, 2024, Fuerst emailed Fulton with Plaintiff's YouTube video. Fuerst wrote: "That the upd thinks this is harassment." University Police had not characterized Plaintiff's speech as harassment; no police report had been filed.

48.    At 9:34 AM, Fulton forwarded to General Counsel Franken: "One more entry. On my way." The notation "one more" establishes prior communications about Plaintiff's speech.

49.    At 10:45 AM, Franken directed Merkle to conduct "formal intake and investigation as soon as possible." The sole basis for the investigation was a student's social media posts about a Black History Month display. (Ex. 1.)

50.    Franken holds a J.D. from USD, graduated first in his class, and clerked for the South Dakota Supreme Court. As General Counsel, Franken was the senior legal officer responsible for ensuring that institutional proceedings complied with constitutional requirements.

51. Either Franken evaluated whether Plaintiff's social media posts constituted protected speech before directing formal investigation, or he did not. If Franken conducted a First Amendment analysis and concluded the speech was unprotected, he reached a conclusion that no institutional official, examiner, or disciplinary board subsequently endorsed — Thompson later admitted no policy was violated, and the Disciplinary Board dismissed all charges. If Franken did not conduct a First Amendment analysis, the University's chief legal officer directed a formal investigation targeting a student's speech without performing the constitutional evaluation his position required.

52. On March 5, 2024, Mays emailed Plaintiff claiming Fuerst "took the display down" because "it was March 1 and Black History month had ended." Mays also wrote: "Ms. Kammer never has said, and does not believe, that Jennie acted without direction or on her own." Mays was copied on Kammer's March 1 email, which stated it was "possible a student worker was just trying to be helpful" — contradicting Mays's characterization.

53. On March 8, 2024, Fulton met with Plaintiff. Fulton identified three institutional complaint channels — Title IX, EEO, and Student Rights and Responsibilities — presenting them as options for Plaintiff's own concerns. He did not disclose that he had forwarded Fuerst's complaint to General Counsel three days earlier, that Franken had directed formal investigation, or that Merkle had opened an intake file.

54. Plaintiff informed Fulton during the meeting that Professor Miller, the standing Examiner, was her academic advisor. Fulton did not recuse Miller or appoint a replacement Examiner.

55. On March 11, 2024, Plaintiff met with Title IX Coordinator Merkle to report racial targeting. Merkle told Plaintiff: "I don't think it's an EEO thing," explaining: "Because that

deals directly with employment." USD's designated EEO official told a student reporting race-based institutional retaliation that race discrimination was outside her jurisdiction.

56.    Merkle stated she had "strong feelings about what's happening with your case," then said: "I just feel like I just want everybody to just not talk about it anymore."

57.    On March 13, 2024, Miller issued the first Examiner Notice, charging Plaintiff with "bullied and harassed Ms. Julianne Severson in person and through videos posted online." The Student Handbook does not include "bullying" or "harassment" as enumerated misconduct. Miller borrowed the complainants' lay terminology rather than applying the Handbook's standards.

58.    Severson's entire evidentiary basis consisted of two items: a video in which Plaintiff mentioned Severson by name but said nothing insulting, threatening, or harassing, and a video of Plaintiff reading a Bible verse about gossip. Severson characterized Plaintiff saying "Good morning" on March 4 and declining to respond to pleasantries on March 6 as "bullying in person."

59.    On March 17, 2024, Fulton distributed an email to the entire law school titled "Free Expression and Civility Within a Community." Fulton wrote: "Foremost is our commitment to free thought and free expression. You have the freedom to form your own thoughts and express those thoughts publicly." Ten days later, Fulton coordinated three adverse actions targeting Plaintiff for her "videos posted online."

60.    On March 19, 2024, attorney Sarah Baron Houy of Bangs, McCullen, Butler, Foye & Simmons, L.L.P. responded to Miller's Examiner Notice in writing, raising a First Amendment defense and demanding dismissal. (Ex. 5.) Miller did not dismiss.

**D. The Coordinated Attack (March 27, 2024)**

61. On March 27, 2024, at 8:39 AM, Plaintiff emailed Registration Officer Carlisle requesting a letter of good standing. At 9:01 AM, Mays was CC'd on the reply certifying Plaintiff "in good standing." Certifying a student in good standing requires confirming no pending disciplinary matters or academic deficiencies.

62. Later that same day, three separate offices took adverse action against Plaintiff.

63. Miller issued an Examiner Notice charging Plaintiff with having "bullied, stalked, and harassed Ms. Jennie Fuerst through videos posted online." The Student Handbook does not include "stalking" as enumerated misconduct. Miller CC'd Dean Fulton on the Notice. An examiner who reports his investigative actions to the appointing authority is not conducting an independent investigation.

64. Thompson issued a No Contact Order to Plaintiff at 4:35 PM. Thompson attempted to reach Plaintiff by phone at approximately 4:30 PM; five minutes later, the Order was delivered by email without a hearing, without evidence, and without identifying any allegation. Thompson CC'd University Police, creating a law enforcement record against Plaintiff for conduct Thompson would determine six days later did not violate any policy.

65. Document metadata embedded in the No Contact Order identifies Merkle as the document creator. Merkle's template included Thompson's digital signature, a CC distribution list, and misspelled the name "Fuerst" as "Furst." Thompson corrected the spelling in subsequent editing passes. This was the first No Contact Order ever issued to a law student at USD.

66. Thompson CC'd Dean of Students Fitzgerald on the No Contact Order email. Fitzgerald is Thompson's direct supervisor and the senior administrator responsible for university-wide student affairs.

67. No USD policy or procedure authorized the issuance of a No Contact Order against a law student for online speech. No prior No Contact Order had ever been issued to any law student at USD for any reason.

68. Either Fitzgerald reviewed the No Contact Order before it was delivered to Plaintiff, or she did not. If Fitzgerald reviewed it, she approved an unprecedented restriction on a law student's campus access without requiring evidence, a hearing, or any factual basis — and without questioning why the Title IX Coordinator's name appeared in the document metadata as creator rather than the Director of Student Rights and Responsibilities. If Fitzgerald did not review it, she failed to supervise an unprecedented measure issued by her direct subordinate against a student who had never been found to have violated any policy. Under either path, Fitzgerald breached her supervisory duty over the office that restricted Plaintiff's liberty.

69. Ulrich filed a misconduct complaint with LSAC accusing Plaintiff of application fraud on March 27, 2024. A true and correct copy of Ulrich's referral and withdrawal is attached as Exhibit 3.

70. On August 3, 2023, Plaintiff had submitted an application amendment and letter of good standing to Registration Officer Carlisle. (¶36.) Carlisle forwarded the documentation to Associate Dean Mays.

71. Ulrich's office is located in the Law School Administration suite. Plaintiff's student file was maintained in the same administrative suite.

72. Seven months elapsed between August 3, 2023 and Ulrich's March 27, 2024 filing.

73.   On April 9, 2024, Ulrich emailed LSAC requesting withdrawal: "Hi, Vicki! The student has sent us a copy of the amendment letter which we never received." Plaintiff's student file — in Ulrich's own administrative suite — contained the amendment. (Ex. 3.)

74.   Either Ulrich checked Plaintiff's student file before filing fraud accusations with LSAC, or she did not. If Ulrich checked the file, she saw the seven-month-old amendment and filed the accusation knowing it was false. If Ulrich did not check the file, she filed career-destroying fraud accusations with a national credentialing body against a student without performing the most basic verification — reviewing the student's own file in her own office. Under either path, the LSAC referral was filed without a factual basis.

75.   The three March 27 actions originated from separate institutional chains of command. Miller reported to Fulton within the law school. Thompson reported to Dean of Students Fitzgerald on the main campus. Ulrich reported externally to LSAC. Three separate chains produced three simultaneous adverse actions targeting the same student for the same protected speech on the same day.

**E. The Aftermath (March 28 - April 16, 2024)**

76.   On March 28, 2024, Plaintiff emailed Moore requesting Zoom access to attend Constitutional Law, citing safety concerns from the No Contact Order.

77.   On January 7, 2024, Moore had offered his entire class Zoom attendance for anticipated weather.

78.   On January 10, 2024, Plaintiff had delivered her accommodation memo to Moore by email. Disability Services Coordinator Gerety was copied. The memo instructed: "If after talking to the student you need further clarification, please contact our office." (¶35.)

79.   Moore did not respond to Plaintiff's March 28 request. Moore did not contact Disability Services before denying the accommodation.

80. Either Moore read the accommodation memo he received on January 10, 2024, or he did not. If Moore read the memo, he knew Plaintiff was a registered student with disabilities, he knew the memo instructed him to contact Disability Services for clarification, and he denied the accommodation without following either instruction — while having offered the identical accommodation to his entire class eight weeks earlier for weather. If Moore did not read the memo, he ignored the disability notification entirely. Under either path, Moore denied a disability accommodation without engaging in the interactive process required by 28 C.F.R. § 35.130(b)(7).

81. That same morning, Plaintiff requested Zoom access from Mays. Mays initially wrote: "Let me know if you encounter any issues." Later, Mays denied the request, writing: "It is entirely possible that Ms. Fuerst may not come to the school." Mays consulted Fuerst — the complainant — about whether Plaintiff should attend classes via Zoom, then denied access based on the complainant's potential absence.

82. On April 2, 2024, Plaintiff met with Thompson. Plaintiff lawfully recorded the conversation pursuant to South Dakota's one-party consent statute, SDCL § 23A-35A-20. Thompson stated: "It is my opinion in what I have seen so far in this investigation that a policy has not been violated." Thompson stated: "So, my attempt to get you into my office was just to ask you to stop talking about Jennie in the videos." Thompson stated: "Right, like you said, freedom of speech. I don't have any way of policing what you're saying on video online." Thompson confirmed: "Frankly, I don't think no-contact orders ever have been sent to a law student."

83. When Plaintiff characterized the coordinated response as weaponization, Thompson agreed: "Yeah, I agree. No, I agree. I agree." Thompson described the coordination: "it

started as one person talking to another person and then it's just kind of continued to get forwarded on to people for someone to act." Thompson lifted the No Contact Order that same day.

84. On April 4, 2024, Plaintiff met with Mays. Mays admitted she had been monitoring Plaintiff's social media: "I've seen some of your videos. I haven't seen 'em all." When Plaintiff asked whether her videos constituted free speech, Mays acknowledged: "Of course. Free speech is free speech." Mays then directed Plaintiff to stop posting videos, telling Plaintiff her posts were not moving her closer to her goals.

85. Plaintiff summarized Mays's proposal: "So take my social media down, take my licks on the misconduct, and I might be able to get out of here with a letter, clean letter." Mays responded: "Pretty much."

86. When Plaintiff stated "It's kind of hard when Neil mad at me. He sicked Katey on me" and "That Katey didn't come out of nowhere," referring to Ulrich's LSAC complaint, Mays did not deny that Fulton directed Ulrich's referral.

87. Fuerst conducted sustained surveillance across four of Plaintiff's social media platforms — YouTube, Instagram, Facebook, and TikTok — compiling over twenty files of screenshots, screen recordings, and transcriptions. On April 8, 2024, after Plaintiff's attorney had demanded dismissal on March 19, Fuerst provided this compilation to Miller as prosecution evidence. Miller accepted it.

88. On April 11, 2024, Plaintiff's attorney responded to the Fuerst Examiner Notice, again raising a First Amendment defense and demanding dismissal. (Ex. 5.)

89. No new underlying conduct by Plaintiff occurred between the March 19 demand for dismissal and Miller's continuation of the prosecution.

90. After receiving the April 11 defense, Miller expanded the investigation, introducing new grounds at the same meeting where Plaintiff's counsel had come to defend the original charges.

91. Either Miller determined that Attorney Baron Houy's First Amendment defense had merit, or he determined it did not. If Miller determined the defense had merit, he expanded the charges to circumvent a valid constitutional defense rather than dismissing — the act of an advocate, not a neutral examiner. If Miller determined the defense lacked merit, he reached a legal conclusion that no court, no institutional official, and no disciplinary board has endorsed — on a question of constitutional law, without a law license in the jurisdiction where he served as Examiner. Under either path, Miller continued and expanded a prosecution targeting constitutionally protected speech after a licensed attorney identified the constitutional defect.

92. On April 16, 2024, the second day of final exams, Fuerst was notified that Plaintiff had filed a Title IX complaint against her. That same day, Fuerst appeared at the window of Plaintiff's testing room, pressed against the glass, and stared at Plaintiff during the Constitutional Law final. Plaintiff reported the incident to the Dean's office. For subsequent exams, staff covered the windows with paper.

**F. The LSAC Charge and Collapse (April 4-9, 2024)**

93. On April 4, 2024, LSAC issued a formal Charge Letter accusing Plaintiff of concealing prior enrollment. A true and correct copy is attached as Exhibit 2. The Charge Letter explicitly cited Plaintiff's YouTube videos as evidence.

94. The Charge Letter contained its own refutation. It stated that in Plaintiff's Howard University application, "under question 7.1 Education, which asks: 'List ALL colleges ...

attended,' she listed Northwestern California University School of Law." LSAC charged Plaintiff with concealing the very enrollment she had disclosed.

95.    The PDF metadata embedded in the evidence dossier identifies the compiler as "Romey, Lanae N" through the Adobe Acrobat Pro Author field. Romey served as Senior Secretary at USD Knudson School of Law from January 2018 through August 2020, working alongside Defendant Ulrich. At the time she compiled the dossier, Romey was employed by the State of South Dakota.

96.    On April 5, 2024, Plaintiff submitted her written response to LSAC with documentation of her August 3, 2023 amendment. On April 9, 2024, Ulrich emailed LSAC requesting withdrawal: "Hi, Vicki! The student has sent us a copy of the amendment letter which we never received." Plaintiff's student file — in Ulrich's own office — contained the amendment. LSAC withdrew the charge that same day. (Ex. 3.)

97.    The charge was active for five days. The harm is permanent. Under LSAC Rules Section 7(a), the filing activated automatic data withholding and triggered nationwide disclosure to every law school to which Plaintiff had applied. Under *In re Application of Widdison*, 539 N.W.2d 671, 674 (S.D. 1995), Jackson must disclose the proceeding on every bar application regardless of outcome.

**G. Complaint Processing and Institutional Notice (April 9 - July 2024)**

98.    On April 9, 2024, Plaintiff filed a complaint against Moore with Merkle, citing "BOR Policy 1.4.3 Human Rights Complaint Procedures" three times.

99.    On May 14, 2024, Merkle acknowledged in writing that complaints involving "race, disability, retaliation and collusion" fell under Policy 1.4.3.

100. Despite this written acknowledgment, Merkle processed every complaint Plaintiff filed under a narrower framework — Title IX rather than the Human Rights Complaint Procedures Plaintiff had invoked by name.

101. Either Merkle knew that Plaintiff's complaints fell under SDBOR Policy 1.4.3, or she did not. If Merkle knew — as her own May 14 email confirms — she deliberately processed complaints under a framework that denied Plaintiff the policy's protections, including the right to appeal to the USD President and the Board's Executive Director. If Merkle did not know, USD's designated EEO official was unaware of the governing policy she was responsible for administering. Under either path, Plaintiff was denied the procedural protections to which her complaints entitled her.

102. On May 1, 2024, the Sioux Falls NAACP wrote to Dean Fulton documenting that Thompson had stated the No Contact Order "held no substance" and reporting "a hostile learning and working environment." A true and correct copy is attached as Exhibit 4. Fulton responded without denying any factual claim in the letter.

103. On May 2, 2024, the Board of Regents assigned Jason Everson, Title IX/EO Investigator at SDSU, to investigate independently of USD. On May 14, 2024, Merkle wrote that "Investigator Everson shared with me your email," confirming the Board's external investigator was sharing complainant communications with the institution under investigation.

104. On May 3, 2024, Merkle dismissed Plaintiff's complaint against Ulrich, stating: "It was asserted that Katy Ulrich's behavior toward you was retaliatory in nature. There is insufficient evidence to support these allegations." Merkle processed a retaliation

complaint under Title IX rather than under BOR Policy 1.4.3, which Plaintiff had invoked by name.

105. On May 9, 2024, USD convened a meeting with Deputy General Counsel Healy, HR Assistant Director Gotto, Plaintiff, and Plaintiff's attorney. When Baron Houy asked whether there was a policy governing investigations, Gotto stated: "I don't know that we do have an investigation policy." Healy acknowledged the proceedings were "postured outside of what our normal complaint policies would look like." Gotto promised to follow up with findings. No follow-up occurred.

106. On May 14, 2024, Miller told Plaintiff that her decision whether to proceed with her counter-complaints would "inform the outcome" of the proceedings against her. No provision of the Student Handbook authorizes conditioning the outcome of one student's case on another student's willingness to withdraw complaints.

107. Complaints targeting Plaintiff were processed within hours on March 27. Plaintiff's complaint against Fuerst was dismissed twenty-eight days later — not on the merits, but because Fuerst was no longer affiliated with the University. Plaintiff's complaint against Moore was closed for "insufficient evidence" without adjudication.

## H. Transfer Blocked and Forced Departure (May - August 2024)

108. On May 9, 2024, Plaintiff requested that transfer letters be sent to four law schools. On May 13, Carlisle cancelled Plaintiff's scheduled meeting and stated Plaintiff "will need to schedule your meeting with Dean Mays" before the letters could be processed. Mays interposed herself as gatekeeper of transfer documentation.

109. Mays had agreed to write Plaintiff a letter of recommendation but never delivered one. On July 9, 2024, Plaintiff informed Mays that none of her transfer applications had been

accepted. Mays responded: "I truly am sorry to hear that; it never occurred to me that you wouldn't get into at least one of the schools of your choice."

110. When Plaintiff contacted the VA about transferring her Chapter 31 benefits, the VA required a reason. Plaintiff wrote: "law school hasn't been a great experience for me and I need a fresh start." Mays, CC'd on the email, responded: "Jackson, I understand. I hope you find a new home."

111. On August 11, 2024, Plaintiff requested a leave of absence. On August 12, Mays granted it: "Should you choose to re-enroll for next academic year, please contact me." Mays instructed Plaintiff to cancel her fall registration.

112. The ABA Annual Questionnaire is submitted by mid-October. USD submitted the 2024 Standard 509 report in October 2024.

113. USD's 2024 Standard 509 report classified Plaintiff as "Other Attrition" — permanent departure — rather than as a student on leave. The report was submitted two months after Mays granted the leave of absence.

114. Either Mays's August 12 grant of leave was genuine, in which case USD misreported Plaintiff's status to the ABA by classifying an active leave as permanent attrition. Or the leave was never intended to preserve Plaintiff's return, in which case the grant was a device to induce departure under false assurances of a right to return. Under either path, USD represented Plaintiff's status inaccurately to either Plaintiff or the national accrediting body.

## I. The Dismissal (September 30 - October 3, 2024)

115. On September 30, 2024, the Dean's office emailed Plaintiff a letter dismissing complaints "from" Plaintiff — language so confusing that Plaintiff's attorney could not determine whether it dismissed charges against Plaintiff or complaints filed by Plaintiff.

116. On October 3, 2024, after counsel demanded clarity, USD issued a corrected letter stating the Disciplinary Board concluded there was "not a basis to proceed" against Plaintiff. A true and correct copy is attached as Exhibit 6.

117. On April 2, 2024, Thompson determined that no policy had been violated and lifted the No Contact Order. (¶82-83.)

118. The Miller prosecution continued for 184 additional days after Thompson's determination.

119. Either the law school knew of Thompson's April 2 determination and continued prosecution anyway, or inter-office coordination was so deficient that one office's exoneration never reached the office maintaining the prosecution. Under either path, Plaintiff was prosecuted for 184 days after the institution's own official determined the underlying conduct did not violate any policy.

120. One hundred ninety days elapsed between the March 27 attack and the October 3 dismissal.

121. The harm is permanent. Plaintiff must disclose this episode on every bar application for the rest of her career. USD subsequently terminated Plaintiff's institutional email account, cutting off access to email records documenting the events. The institution retained its copies while destroying Plaintiff's access to hers.

## J. Procedural Failures and Structural Conflicts

122. SDBOR Policy 1.4.3, Section 5.1.2.2, prohibits applying institutional complaint procedures to suppress a viewpoint. Every adverse action targeted one viewpoint: Plaintiff's criticism of the institution's diversity efforts.

123. SDBOR Policy 1.4.3, Section 13.5.1, requires interim measures to ensure complainants are protected from retaliation. No interim measures were provided when Plaintiff filed her complaints. Instead, the disciplinary prosecution continued and expanded.

124.   USD's Disability Services office had notice of every accommodation denial and every complaint alleging disability discrimination. On April 11, 2024, Plaintiff copied Gerety on a complaint explicitly alleging "discrimination based on disability." Upon information and belief, Disability Services took no action. Gerety departed USD on July 19, 2024 without ensuring continuity of disability protections.

125.   Deputy General Counsel Healy took no action between May 9, 2024 and October 3, 2024 — 147 days — to halt, correct, or recommend termination of proceedings he acknowledged were "postured outside" normal policies. Healy possessed the institutional authority to recommend termination to General Counsel Franken and to advise the Dean's office that the prosecution lacked legal basis.

# V. CAUSES OF ACTION

## COUNT I — FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Fitzgerald, Franken, Healy, and Merkle in their individual and official capacities; and against Fuerst, Severson, Romey, and Does 1-10 in their individual capacities*

126. Plaintiff incorporates all preceding paragraphs.

127. Plaintiff engaged in constitutionally protected speech when she posted videos describing the Black History Month display as inadequate and criticizing the law school's treatment of minority students. Speech on matters of public concern at a public university occupies the highest rung of First Amendment protection. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Plaintiff's speech is independently protected under SDCL § 13-53-52.

128. Defendants took adverse actions that would deter a person of ordinary firmness from continuing to exercise First Amendment rights. *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004). The adverse actions include the disciplinary prosecution, the No Contact Order, the LSAC referral, the denial of disability accommodations, the transfer obstruction, the complaint processing asymmetry, and the 190-day duration of the prosecution.

129. Protected speech was the but-for cause of every adverse action. Mays confirmed on April 4, 2024: "You're posting, you're posting all this stuff and it's making everybody upset." The March 5 email chain (Ex. 1) documents the forwarding of Plaintiff's video as the triggering event. Each Examiner Notice charged "videos posted online."

130. Defendants cannot carry the *Mt. Healthy* burden. Thompson stated no policy was violated. (¶82.) The Disciplinary Board dismissed all charges. (Ex. 6.) LSAC withdrew in thirteen days. (¶96.) Thompson acknowledged she lacked authority over online speech. (¶82.) No independent justification exists.

131.    Fuerst and Severson are liable as state actors under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982), as willful participants in joint action with state officials. Mays solicited Fuerst's complaint. (¶44.) Miller accepted Fuerst's evidence after counsel demanded dismissal. (¶87.) Severson's complaint became the vehicle for Miller's prosecution. (¶57-58.)

132.    The right to be free from government retaliation for speech on matters of public concern has been clearly established since *Pickering*. In this District, Judge Schreier held in *Hook v. Rave*, No. 4:25-CV-04188-KES, 2025 U.S. Dist. LEXIS 190287 (D.S.D. Sept. 24, 2025), that a USD professor's free speech rights were likely violated when USD retaliated for constitutionally protected expression. Qualified immunity does not shield defendants.

## COUNT II — CIVIL CONSPIRACY (42 U.S.C. § 1983)
*Against all individual Defendants*

133.    Plaintiff incorporates all preceding paragraphs.

134.    The March 5, 2024 email chain (Ex. 1) is documentary evidence of the agreement. Fuerst to Fulton to Franken to Merkle in three hours, ending with a directive for "formal intake and investigation as soon as possible." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).

135.    Mays's March 4 text — "Now can you file an administrative complaint?" — is direct evidence that a state official solicited a private individual to initiate the adverse action. Fuerst confirmed she saw no grounds. Mays directed her to find them. (¶44.)

136.    Three separate offices, operating under separate chains of command, produced three simultaneous adverse actions on March 27, 2024. Simultaneous action across independent chains of command does not occur absent coordination. Each conspirator performed overt acts: Fulton forwarded the video and appointed the conflicted examiner; Mays solicited the

complaint and denied accommodations; Miller prosecuted for 190 days; Thompson issued the NCO; Ulrich filed the LSAC referral; Franken directed the investigation; Merkle created the NCO template and misrouted complaints.

137.    The intracorporate conspiracy doctrine does not bar this claim. The conspiracy extended beyond the institution through Fuerst, Severson, Romey, and LSAC. Each individual defendant acted from personal motivation distinct from institutional function. The conduct fell outside the scope of employment — suppressing constitutionally protected speech is not within any defendant's job description.

138.    The conspiracy caused injury: a 190-day prosecution dismissed as "not a basis to proceed," lifetime bar disclosure obligations, blocked transfers, constructive expulsion, and exacerbation of service-connected disabilities.

## COUNT III — PROCEDURAL DUE PROCESS (42 U.S.C. § 1983)
*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Fitzgerald, Franken, Healy, and Merkle in their individual and official capacities*

139.    Plaintiff incorporates all preceding paragraphs.

140.    Plaintiff possessed protected liberty and property interests in continued enrollment, her professional reputation, and freedom from stigmatizing government action. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Goss v. Lopez*, 419 U.S. 565, 574 (1975).

141.    No defendant provided pre-deprivation process. Thompson issued the NCO without notice or hearing. (¶64.) Ulrich filed the LSAC referral without notice, hearing, or file verification. (¶69-74.) Miller initiated prosecution without identifying the specific Handbook provisions allegedly violated. (¶57, 63.)

142.    The Examiner was not a neutral decisionmaker. *Withrow v. Larkin*, 421 U.S. 35, 46 (1975). Miller was Plaintiff's academic advisor, was not admitted to the South Dakota bar, CC'd

Dean Fulton on investigative actions, expanded charges after counsel raised a constitutional defense, and conditioned outcomes on Plaintiff's willingness to withdraw counter-complaints. (¶¶54, 63, 90-91, 106.)

143. Thompson determined on April 2, 2024 that no policy was violated. (¶82.) The Miller prosecution continued 184 additional days. (¶¶117-119.) The right to due process before deprivation of liberty or property has been clearly established since *Goss v. Lopez*, 419 U.S. 565 (1975). Qualified immunity does not shield defendants.

## COUNT IV — TITLE IX RETALIATION (20 U.S.C. § 1681)
### *Against University of South Dakota*

144. Plaintiff incorporates all preceding paragraphs.

145. Plaintiff engaged in protected activity by reporting sex-based harassment, filing a Title IX complaint against Fuerst on April 16, 2024, and participating in related proceedings. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

146. USD took materially adverse actions after Plaintiff's protected activity: the disciplinary prosecution continued and expanded; Plaintiff's Title IX complaint against Fuerst was dismissed in twenty-eight days without merits adjudication while the prosecution against Plaintiff continued for months; and the complaint processing asymmetry demonstrates retaliatory motive. (¶107.)

147. Merkle's routing decisions compounded the retaliation. Despite acknowledging on May 14, 2024 that complaints involving "race, disability, retaliation and collusion" fell under Policy 1.4.3, Merkle processed every complaint by Plaintiff under a narrower framework and misrouted Plaintiff's complaints to deny appellate protections. (¶¶98-101.)

## COUNT V — TITLE VI DISCRIMINATION (42 U.S.C. § 2000d)

*Against University of South Dakota*

148.    Plaintiff incorporates all preceding paragraphs.

149.    USD receives federal financial assistance. Title VI prohibits discrimination based on race in federally funded programs. 42 U.S.C. § 2000d. The *Arlington Heights* factors establish discriminatory purpose through circumstantial evidence. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

150.    Historical background: USD graduated an average of 0.8 Black students per year for fifteen years. (¶37.) In Fall 2024, zero Black students enrolled. Sequence of events: Plaintiff criticized racial inadequacy in February 2024; the coordinated attack struck in March 2024. Departures from normal procedures: the NCO was unprecedented (¶65, 67); Healy acknowledged proceedings were "postured outside" normal policies (¶105); Gotto admitted no investigation policy existed (¶105). Contemporary statements: Thompson stated the NCO was issued to silence speech (¶82); Mays acknowledged "free speech is free speech" then conditioned academic standing on silence (¶84-85).

151.    Fuerst, white, filed complaints she admitted had no grounds and faced no consequence. (¶44.) Plaintiff, Black, was prosecuted for 190 days. The surveillance was racially targeted: Fuerst monitored only the Black student who criticized the institution's racial record. (¶87.)

152.    Title VI also prohibits retaliation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 179 (2005). Plaintiff opposed practices made unlawful by Title VI and suffered adverse action as a result.

## COUNT VI — SECTION 504 RETALIATION AND DISCRIMINATION (29 U.S.C. § 794)

*Against University of South Dakota*

153.    Plaintiff incorporates all preceding paragraphs.

154. Plaintiff is a qualified individual with a disability whose accommodations were documented and approved. On March 28, 2024, Moore and Mays independently denied Plaintiff's Zoom accommodation request. (¶¶76-81.) Moore had offered Zoom to his entire class on January 7, 2024 for weather. (¶77.) Moore denied it to a disabled veteran for safety reasons. Mays consulted the complainant about whether to grant the disabled student's request, subordinating disability access to the complainant's preferences. (¶81.)

155. The OCR Resolution Agreement (Docket No. 07-24-2185) confirms USD's pattern of disability access violations during the same period. (¶38.) USD accepted VA Chapter 31 funds subject to a federal compliance condition requiring compliance with Section 504. 38 C.F.R. § 21.292(b)(3). Section 504 retaliation is independently established: Plaintiff requested accommodations and raised disability-based concerns; USD denied accommodations and continued prosecution.

## COUNT VII — ADA TITLE II VIOLATION (42 U.S.C. § 12132)
### *Against University of South Dakota*

156. Plaintiff incorporates all preceding paragraphs.

157. USD denied reasonable accommodations without engaging in the interactive process required by 28 C.F.R. § 35.130(b)(7). Neither Moore nor Mays contacted Disability Services before denying the Zoom request. (¶¶79-81.) Moore uploaded mandatory course materials in formats incompatible with Plaintiff's assistive technology.

158. The OCR Resolution Agreement confirms the pattern. (¶38.) USD dismissed Plaintiff's internal complaints for "insufficient evidence"; federal investigators found systemic violations of the same type. The ADA independently prohibits retaliation. 42 U.S.C. § 12203(a).

## COUNT VIII — LIBEL PER SE

*Against Ulrich*

159. Plaintiff incorporates all preceding paragraphs.

160. Ulrich published false statements when she filed a written LSAC referral accusing Plaintiff of "application fraud." (Ex. 3.) The referral identified Plaintiff by name, LSAC number, and institution. SDCL § 20-11-4; SDCL § 20-11-5. The accusation imputes commission of a crime and is incompatible with the proper exercise of a lawful profession — libel per se on two independent grounds. SDCL § 20-11-5(1), (3).

161. The qualified privilege is defeated by actual malice. *Setliff v. Akins*, 2000 SD 124, ¶ 22, 616 N.W.2d 878, 885. Ulrich's student file contained the amendment disproving the accusation. (¶¶69-74.) Filing fraud accusations without checking the file in one's own office constitutes reckless disregard for truth. This claim is subject to the two-year limitation of SDCL § 15-2-15. Ulrich filed the LSAC referral on March 27, 2024. Plaintiff timely filed the original complaint on March 26, 2026. The limitations period was tolled during the pendency of the prior action and for thirty days following its dismissal pursuant to 28 U.S.C. § 1367(d). This claim is timely.

## COUNT IX — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*Against Fulton, Mays, Miller, Moore, Thompson, Fitzgerald, Ulrich, Franken, Healy, Merkle, Fuerst, Severson, and Romey*

162. Plaintiff incorporates all preceding paragraphs.

163. Defendants' coordinated conduct was extreme and outrageous. *Burbank Grease Servs., LLC v. Sokolowski*, 2006 SD 81, ¶ 48, 717 N.W.2d 781, 797. On a single day, three offices attacked a disabled veteran for constitutionally protected speech, using processes their own officials later admitted were baseless, unprecedented, and weaponized. (¶¶82-83.) The power differential — administrators wielding state authority against a student — and

knowledge of Plaintiff's disability elevate the outrageousness. Restatement (Second) of Torts § 46 cmt. e (Am. L. Inst. 1965).

164.  Plaintiff suffered severe emotional distress including exacerbation of service-connected PTSD and anxiety, fear of attending campus, hypervigilance, and ongoing psychological harm. The distress is ongoing and permanent due to lifetime bar disclosure obligations. This claim is timely under SDCL § 15-2-14 (three-year limitation).

## COUNT X — ABUSE OF PROCESS

*Against Fulton, Mays, Thompson, Fitzgerald, Miller, Moore, Ulrich, Franken, Healy, Merkle, Fuerst, Severson, Romey, and Does 1-10*

165.  Plaintiff incorporates all preceding paragraphs.

166.  Abuse of process requires an ulterior purpose and a willful act not proper in regular proceedings. *Brishky v. State*, 479 N.W.2d 489 (S.D. 1991). Fulton used disciplinary proceedings for institutional retaliation. (¶48, 53-54, 59.) Mays solicited a complaint she knew lacked grounds. (¶44.) Thompson used the NCO to compel silence. (¶82.) Ulrich used LSAC reporting to destroy transfer prospects without file verification. (¶69-74.) Miller used examination powers for prosecution-building after a constitutional defense was raised. (¶88-91.) Franken directed investigation targeting protected speech. (¶49-51.) Healy ratified defective proceedings through silence after formal legal notice. (¶105, 125.)

167.  Miller's May 14, 2024 statement linking the outcome of proceedings against Plaintiff to her willingness to withdraw counter-complaints is an independent act of abuse of process. (¶106.) No Handbook provision authorizes conditioning one case's outcome on another student's complaint decisions.

## COUNT XI — TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

*Against USD, Ulrich, Mays, Fulton, Miller, Thompson, Franken, and Fuerst*

168.  Plaintiff incorporates all preceding paragraphs.

169.  Plaintiff had transfer applications pending at multiple law schools. Defendants intentionally interfered through Ulrich's LSAC referral (which froze credentials nationwide under LSAC Rules Section 7(a)), Miller's 190-day prosecution (which required disclosure on every transfer application), Mays's withheld recommendation letter and gatekeeping of transfer documents (¶108-109), and Fulton's failure to resolve the prosecution before transfer deadlines.

170.  Mays's July 11, 2024 statement is a party admission: "I truly am sorry to hear that; it never occurred to me that you wouldn't get into at least one of the schools of your choice." (¶109.) Mays knew of the prospective relationships, expected acceptance, and expressed surprise at universal rejection — establishing that the interference was outside ordinary competitive behavior.

## COUNT XII — INSTITUTIONAL NEGLIGENCE AND NEGLIGENT SUPERVISION

*Against University of South Dakota and South Dakota Board of Regents*

171.  Plaintiff incorporates all preceding paragraphs.

172.  USD breached its duty of reasonable care through systemic failures: no verification before LSAC filings (¶69-74); no conflict screening for examiner appointments (¶54); no supervisory review of unprecedented measures (¶66-68); no inter-office coordination between Thompson's April 2 determination and Miller's continuing prosecution (¶117-119); and no Disability Services intervention despite notice of accommodation denials (¶124).

173. These are ministerial failures, not discretionary functions. *Hansen v. South Dakota Dep't of Transportation*, 1998 SD 109. Verifying a student file before filing a fraud accusation requires no policy judgment. Screening an examiner for conflicts requires applying published rules. Sovereign immunity does not protect ministerial noncompliance. *Kyllo v. Panzer*, 535 N.W.2d 896, 900 (S.D. 1995).

174. The Board of Regents authored SDBOR Policies 1.4.3 and 1.4.4, creating the framework that enabled misrouting. (¶98-101.) Either USD's administrators were unaware of the policies, or they consciously disregarded them.

## COUNT XIII — EQUAL PROTECTION (42 U.S.C. § 1983)

*Against Fulton, Mays, Miller, Moore, Ulrich, Thompson, Franken, Fitzgerald, Healy, and Merkle in their individual and official capacities; and against Fuerst and Severson individually*

175. Plaintiff incorporates all preceding paragraphs.

176. The Equal Protection Clause prohibits state actors from treating individuals differently on the basis of race. Plaintiff, a Black woman, was subjected to differential treatment compared to similarly situated non-Black students. Fuerst, white, filed complaints with no grounds and faced no consequence. (¶44.) Plaintiff, Black, was prosecuted for 190 days. The surveillance was racially selective — Fuerst monitored only the Black student who criticized the institution. (¶87.)

177. The *Arlington Heights* factors assessed cumulatively establish discriminatory purpose: the historical pattern (0.8 Black graduates per year, ¶37); the sequence (racial criticism followed by coordinated attack); the procedural departures (unprecedented NCO, no investigation policy, proceedings "postured outside" norms, ¶105); and the contemporary statements (Mays conditioning academic survival on speech surrender, ¶85; Thompson admitting baselessness, ¶82).

178. The racial character of the coordinated action is not negated by the participation of Mays, who shares Plaintiff's racial background. The Equal Protection Clause prohibits race-based government action regardless of the race of the official who implements it. Qualified immunity does not shield defendants; the right to equal protection regardless of race has been clearly established since *Brown v. Board of Education*, 347 U.S. 483 (1954).

## COUNT XIV — CONSPIRACY TO DEPRIVE CIVIL RIGHTS (42 U.S.C. § 1985(3))

*Against all individual Defendants*

179. Plaintiff incorporates all preceding paragraphs.

180. Two or more persons conspired to deprive Plaintiff of equal protection of the laws, motivated by racial animus. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Plaintiff's speech was about race, delivered by the only Black student who raised those concerns, at an institution that graduated fewer than one Black student per year. (¶37.) The agreement is established through the March 5 email chain (Ex. 1) and the March 27 simultaneous actions across independent chains of command. (¶75.)

181. Section 1985(3) independently reaches private actors without requiring state action. *Griffin*, 403 U.S. at 101. Fuerst, Severson, and Romey are liable as private conspirators. The intracorporate doctrine does not apply for the reasons established in Count II. (¶137.)

## COUNT XV — BREACH OF IMPLIED CONTRACT

*Against University of South Dakota and South Dakota Board of Regents*

182. Plaintiff incorporates all preceding paragraphs.

183. USD's Student Handbook, academic policies, and published procedures created an implied contract. SDCL § 53-1-3. USD invoked these procedures to prosecute Plaintiff, then violated them: Miller prosecuted under terms absent from the Handbook (¶57, 63);

Thompson issued an NCO without the process the Student Code requires (¶64); Merkle processed complaints under frameworks other than the one Plaintiff invoked by name (¶98-101).

184. Every contract imposes a duty of good faith and fair dealing. Restatement (Second) of Contracts § 205 (Am. L. Inst. 1981). USD's use of its own procedures to prosecute while refusing to honor the same procedures' protections breaches the implied covenant.

## COUNT XVI — UNJUST ENRICHMENT
### *Against University of South Dakota*

185. Plaintiff incorporates all preceding paragraphs.

186. USD received VA Chapter 31 Vocational Rehabilitation funds for Plaintiff's enrollment. USD certified compliance with Section 504 and the ADA as a condition of receiving those funds. (¶32.) USD violated both statutes. (¶76-81, 38.) Retention of federal funds received under false certification of compliance constitutes unjust enrichment.

## COUNT XVII — MALICIOUS PROSECUTION
*Against Fulton, Mays, Miller, Ulrich, Thompson, Merkle, Franken, Fuerst, Severson, and Romey*

187. Plaintiff incorporates all preceding paragraphs.

188. Each identified defendant commenced or continued proceedings against Plaintiff without probable cause and with malice. Thompson stated no policy was violated on April 2, 2024. (¶82.) Miller continued prosecution 184 days after that determination. (¶117-119.) Ulrich filed LSAC accusations without checking the file. (¶69-74.) The Disciplinary Board found the charges were "not a basis to proceed." (Ex. 6.)

189. Favorable termination is established by the October 3, 2024 dismissal (Ex. 6) and LSAC's April 9, 2024 withdrawal (Ex. 3). Malice is established by the coordination documented in the March 5 email chain (Ex. 1), the solicitation of a complaint Mays knew lacked grounds

(¶44), the expansion of charges after a constitutional defense was raised (¶¶88-91), and the 190-day duration despite Thompson's April 2 determination (¶117-119).

## VI. DAMAGES

190. Plaintiff's education was funded entirely through VA Chapter 31 Vocational Rehabilitation benefits earned through military service. USD certified compliance with Section 504 and the ADA as a condition of receiving those funds. (¶32.) The collateral source rule prevents reduction of any recovery by the value of VA benefits. *Papke v. Harbert*, 2007 SD 56, ¶ 18, 738 N.W.2d 510, 518. VA Chapter 31 benefits are not transferable at will; the VA must independently approve any new institution, and benefits lost to a retaliatory constructive expulsion cannot be presumed recoverable elsewhere.

191. Plaintiff was constructively expelled from South Dakota's only law school. Defendants' coordinated conduct — the 190-day prosecution, the No Contact Order, the LSAC referral, the denial of disability accommodations, the blocked transfers, and the complaint processing asymmetry — made continued enrollment untenable. Plaintiff departed on a leave of absence that USD subsequently reported to the ABA as permanent attrition. (¶¶111-114.)

192. Plaintiff must disclose this episode on every bar application, professional license application, and graduate school admission for the duration of her professional career. *In re Application of Widdison*, 539 N.W.2d 671, 674 (S.D. 1995). The South Dakota Supreme Court denied bar admission to a USD law graduate who failed to disclose a plagiarism charge that had been resolved informally. Plaintiff cannot avoid the disclosure obligation created by Defendants' conduct. This harm is permanent, cannot be mitigated, and compounds with every future application.

193.  Plaintiff suffered economic losses including but not limited to: relocation costs incurred to attend USD; costs of applying to transfer institutions; lost income during educational disruption; the diminished value of an incomplete legal education; and the cost of resuming legal education at a new institution, if one can be found that will accept a student whose LSAC record reflects a misconduct referral and whose transcript reflects a constructive expulsion.

194.  Plaintiff's transfer applications to multiple law schools were universally rejected. (¶109.) Mays's own party admission — "it never occurred to me that you wouldn't get into at least one of the schools of your choice" — confirms the rejections were outside the range of normal outcomes and attributable to the LSAC referral, the pending disciplinary charges, and the withheld recommendation. (¶109.)

195.  Plaintiff suffered and continues to suffer severe emotional distress, including exacerbation of service-connected PTSD and anxiety disorders, fear of attending campus that required her father to investigate hiring a personal bodyguard, hypervigilance, loss of ability to concentrate, and ongoing psychological harm from the knowledge that these proceedings will follow her through every professional application for the rest of her career.

196.  USD has a documented pattern of retaliating against individuals who exercise protected rights and settling the resulting claims. In February 2024, the Board of Regents resolved *Ghebrekidan v. South Dakota Board of Regents* for $100,000, a Title IX retaliation case involving a single adverse action against a single complainant. Plaintiff alleges three simultaneous adverse actions, a 190-day prosecution, a nationwide fraud referral, disability accommodation denials, blocked transfers, and constructive expulsion.

197. Plaintiff seeks punitive damages against each individual Defendant pursuant to 42 U.S.C. § 1983 and South Dakota law. Under the *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-75 (1996) reprehensibility framework: (1) the harm was physical and emotional, not purely economic — Plaintiff's service-connected disabilities were exacerbated; (2) Defendants demonstrated indifference to the health and safety of a disabled veteran; (3) the target was financially vulnerable — a student dependent on VA benefits with no independent means of continuing her education; (4) the conduct was not isolated — it was coordinated across three offices over 190 days; and (5) the harm resulted from intentional action, not accident — Mays solicited the complaint, Fulton forwarded the video, Franken directed the investigation, Thompson admitted the NCO was baseless, and Miller continued prosecution after being told no policy was violated.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**A.** Enter judgment in favor of Plaintiff on all counts.

**B.** Award compensatory damages in an amount to be determined at trial for reputational harm, emotional distress, loss of educational opportunity, economic losses, and exacerbation of service-connected disabilities.

**C.** Award punitive damages against each individual Defendant whose conduct was willful, malicious, and undertaken with conscious disregard for clearly established constitutional rights.

**D.** Enter declaratory judgment that: (i) Defendants violated Plaintiff's rights under the First and Fourteenth Amendments; (ii) the disciplinary proceedings, the No Contact Order, and the LSAC referral were retaliatory and without merit; (iii) Plaintiff's social media posts constituted protected speech; and (iv) Plaintiff bears no professional obligation to disclose the retaliatory proceedings, and Defendants shall not represent to any third party that those proceedings reflect adversely on Plaintiff's character or fitness.

**E.** Enter permanent injunctive relief requiring USD to: (i) expunge all records of the retaliatory proceedings from Plaintiff's student file; (ii) notify LSAC in writing that the referral was retaliatory and without basis; (iii) notify all law schools to which Plaintiff applied for transfer that the proceedings were retaliatory and dismissed; (iv) implement policies requiring file verification before LSAC complaints, conflict screening for examiner appointments, and constitutional review before issuing contact orders; and (v) provide training on First Amendment protections for student speech.

**F.** Order that a certified copy of this Court's judgment be provided to Plaintiff in a form suitable for attachment to bar admission applications.

**G.** Award nominal damages on any count for which compensatory damages have not been proved. *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021).

**H.** Award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205, and 29 U.S.C. § 794a(b).

**I.** Award prejudgment and post-judgment interest.

**J.** Reserve Plaintiff's right to amend this complaint in accordance with Federal Rule of Civil Procedure 15.

**K.** Grant such other relief as the Court deems just and proper.

## VIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Date: APRIL 6, 2026
Respectfully submitted,

Tiauna Jackson, Pro Se
101 S. Reid Street, Ste 307
Sioux Falls, SD 57103
TJ@TJA.AGENCY
USD@SUEEMALL.COM

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jackson, Tiauna

**(b)** County of Residence of First Listed Plaintiff    Lincoln
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Tiauna Jackson, Pro Se (818) 538-5305
101 S. Reid Street, Ste 307 Sioux Falls, SD 57103

### DEFENDANTS

University of South Dakota et al; (see attachment)

County of Residence of First Listed Defendant    Clay
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine / [ ] 345 Marine Product Liability | | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [X] 440 Other Civil Rights / **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | [ ] 550 Civil Rights | | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
First Amendment retaliation, race discrimination, and disability discrimination against law student.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ $27,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [·] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE    APRIL 6, 2026

SIGNATURE OF ATTORNEY OF RECORD    *[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH DAKOTA**
**SOUTHERN DIVISION**

TIAUNA JACKSON,

Plaintiff,

v.

UNIVERSITY OF SOUTH DAKOTA, et al.,

Defendants.

**ATTACHMENT TO CIVIL COVER SHEET (JS 44)**

**LIST OF DEFENDANTS**

1.   University of South Dakota
2.   South Dakota Board of Regents
3.   Fulton, Neil — Dean, USD Knudson School of Law
4.   Mays, Shirley — Associate Dean of Academic Affairs, USD Knudson School of Law
5.   Miller, Robert — Professor, USD Knudson School of Law
6.   Ulrich, Katey — Director of Admissions, USD Knudson School of Law
7.   Thompson, Emma — Director of Student Rights and Responsibilities, USD
8.   Fitzgerald, Kate — Dean of Students, USD
9.   Franken, A.J. — General Counsel, USD
10.   Healy, Christopher — Deputy General Counsel, USD
11.   Gestring, Sheila — President, USD (official capacity only)
12.   Merkle, Jean — Director of EEO/Title IX Coordinator, USD
13.   Moore, Tyler — Professor, USD Knudson School of Law
14.   Fuerst, Jennie — Individual
15.   Severson, Julianne — Individual
16.   Romey, Lanae N. — Individual

17.   Does 1-10 — Identities unknown

This envelope is for use with the following services:

**UPS Next Day Air®**
**UPS Worldwide Express®**
**UPS 2nd Day Air®**

Do not use this envelope for:

**UPS Ground**
**UPS Standard**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

Visit **UPS.com**

**Apply shipping documents on this side.**

Scan QR code to schedule a pickup

**Domestic Shipments**
- To qualify for the letter rate, UPS Express® envelopes may only contain correspondence, urgent documents, and/or electronic media, and must weigh 8 oz. or less. UPS Express envelopes containing items other than those listed or weighing more than 8oz. will be billed by weight.

**International Shipments**
- The UPS Express envelope may be used only for documents of no commercial value. Certain countries consider electronic media as documents. Visit ups.com/importexport to verify if your shipment is classified as a document.

- To qualify for the letter rate, the UPS Express envelope must weigh 8 oz. or less. UPS express envelopes weighing more than 8 oz. will be billed by weight.

**Note:** UPS Express envelopes are not recommended for shipments of electronic media containing sensitive personal information or breakable items. Do not send cash or cash equivalent.

## Reusable Express Env

### Legal Size
Reduce paper waste by using this ~ the return to sender or with another ~ flap above.

The UPS Store Smart Label
Tracking #
1Z08E88V011429 8269

International Shipping Notice ~ ~ rules relating to liability and other terms and/or conditions ~ ~ Unification of Certain Rules Relating to International Carriage by Ai ~ ~ ') and/or the Convention on the Contract for the International Carriage of Goo ~ ~ CMR Convention"). These commodities, technology or software were exported from ~ ~ accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

**Serving you for more than 110 years**
**United Parcel Service.®**

 

SHIP TO:

TIAUNA JACKSON
(602) 614-9911
THE UPS STORE #4801
3230 SYCAMORE RD
DEKALB    IL 60115-9621

(605) 330-6600
CLERK, US DISTRICT COURT
RM 128
400 S PHILLIPS AVE

SIOUX FALLS    SD 57104-6851

SHP WT: 2 LBS
DATE: 06 APR 2026

1.7 LBS LTR

UPS NEXT DAY AIR

TRACKING #:  1Z 08E 88V 01 1429 8269

SD 571 9-01

REF #1: HC

BILLING: P/P

MHD1HZU8N52UK  ISH 13.00C ZZP230  EP 11.

P: RED    S: NORTH
21XX - 1028
8269
CLERK, US DISTRICT COURT
400 S PHILLIPS AVE
RM 128
SIOUX FALLS SD 57104

I: R26
1030

 100% Recycled fiber
80% Post-Consumer

For information about UPS's privacy practices or to opt out from the sale of personal information, please see the UPS Privacy Notice at www.ups.com   01019511212   05/21   PAC   United Parcel Service

Extremely Urgent

Reusable Express

